UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Campbell Family Trust, Jack Hornstein, Anne H. Bradley, Casey Leblanc, Jacqueline Peiffer, Joseph Lipovich, and Valderrama Family Trust <br><br><br> Plaintiffs, <br><br> v. <br><br> J.P. Morgan Investment Management, Inc., JP Morgan Funds Management, Inc. and JPMorgan Chase Bank, N.A. <br><br> Defendants. | Civil No. 2:15-cv-2923 <br><br> **COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiffs Campbell Family Trust, Jack Hornstein, Anne H. Bradley, Casey Leblanc, Jacqueline Peiffer, Joseph Lipovich, and Valderrama Family Trust (together, "Plaintiffs") bring this action against Defendants J.P. Morgan Investment Management, Inc. ("JPMIM"), JPMorgan Funds Management, Inc. ("JPMFM") and JPMorgan Chase Bank, N.A. ("JPMCB," and collectively with JPMIM and JPMFM, the "Defendants"). Plaintiffs allege the following upon information and belief except for those allegations as to themselves, which are alleged upon personal knowledge. The allegations are based upon an investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information.

### OVERVIEW OF ACTION

1.  Plaintiffs bring this action against Defendants pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b) on behalf of and for

the benefit of the following funds: (i) the JPMorgan Mid Cap Value Fund (the "Mid Cap Value Fund"); (ii) the JPMorgan Large Cap Growth Fund (the "Large Cap Growth Fund"); (iii) the JPMorgan Value Advantage Fund (the "Value Advantage Fund"); (iv) JPMorgan Strategic Income Opportunities Fund ("the Strategic Opportunities Fund"); and (v) JPMorgan US Equity Fund (the "US Equity Fund").

2.      JPMIM is the investment adviser to the Mid Cap Value Fund, the Large Cap Growth Fund, and the Value Advantage Fund (collectively, the "Advisory Claim Funds") and receives an annual fee from each of them for providing investment advisory services, including managing each of the Advisory Claim Fund's portfolio of assets.

3.      Under Section 36(b), JPMIM owes a fiduciary duty to each of the Advisory Claim Funds with respect to the investment advisory fees paid by each of the Advisory Claim Funds.

4.      JPMIM breached that fiduciary duty by receiving investment advisory fees from each of the Advisory Claim Funds that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMIM and could not have been the product of arm's-length bargaining.

5.      The investment advisory fee rates charged to the Advisory Claim Funds are as much as 69% higher than the rates negotiated at arm's length by JPMIM with other clients for the same or substantially the same investment advisory services.

6.      As a result of their higher fee rates, the Advisory Claim Funds collectively pay JPMIM as much as $84.5 million more in fees each year than they would pay for JPMIM's investment advisory services had the fee rates been negotiated at arm's length.

7.      The Advisory Claim Funds' investment advisory fee rates have enabled JPMIM to retain for itself the benefits of economies of scale resulting from increases in each of the

2

Advisory Claim Funds' assets under management during recent years, without appropriately sharing those benefits with the Advisory Claim Funds.

8.     The aggregate amount of investment advisory fees paid by the Advisory Claim Funds has increased by more than 411% in recent years, from less than $45.7 million in fiscal year 2008 to more than $233 million for the most recent fiscal year ending June 30, 2015.

9.     The increase in the fees paid by each of the Advisory Claim Funds was not accompanied by a proportionate increase in the services provided by JPMIM or in the cost of providing investment advisory services to the Advisory Claim Funds.

10.     The increase in fees paid by each of the Advisory Claim Funds resulted in increased profits for JPMIM at the expense of the Advisory Claim Funds.

11.     JPMFM is an affiliate of JPMIM. JPMFM is the administrator to the Advisory Claim Funds, the Strategic Income Opportunities Fund and the US Equity Fund (collectively the "Funds").

12.     JPMFM receives an annual fee from each of the Funds for providing administration services.

13.     JPMCB is the sub-administrator to the Funds and an affiliate of JPMIM. JPMCB receives a portion of the fees paid to JPMFM for providing administration services to each of the Funds.

14.     Under Section 36(b), JPMFM and JPMCB owe a fiduciary duty to each of the Funds with respect to the administration fees paid by each of the Funds.

15.     JPMFM and JPMCB breached that fiduciary duty by receiving administration fees from each of the Funds that are so disproportionately large that they bear no reasonable

relationship to the value of the services provided by them and could not have been the product of arm's-length bargaining.

16.     The administration fees charged to the Funds are higher than the fees negotiated at arm's length by JPMFM and JPMCB and their affiliates with other clients for the same or substantially the same administration services and higher than the fees charged by other administrators to unaffiliated mutual funds for the same or substantially the same services.

17.     As a result of their higher rates, the Funds collectively pay JPMFM and JPMCB as much as $47.6 million more in fees each year than they would pay for JPMFM's and JPMCB's administration services had the fee rates been negotiated at arm's length.

18.     Plaintiffs bring this action to recover for each of the Advisory Claim Funds the excessive and unlawful investment advisory fees and to recover for each of the Funds the excessive and unlawful administration fees in violation of Section 36(b), as well as lost profits and other actual damages caused by each of the Funds' payment of those fees.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b).

20.     This Court has jurisdiction of the claims pursuant to Sections 36(b)(5) and 44 of the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

21.     Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendants are inhabitants of this district, maintain offices in this district, and/or transact business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

22.     Plaintiff Campbell Family Trust, a trust organized under the laws of the State of California, is a shareholder in the Mid Cap Value Fund and has continuously owned the shares in the Mid Cap Value since at least September 2014.

23.     Plaintiff Jack Hornstein, a resident of the State of New York, is a shareholder in the Large Cap Growth Fund and has continuously owned the shares in the Large Cap Growth Fund since at least September 2014.

24.     Plaintiff Anne H. Bradley, a resident of the State of Texas, is a shareholder in the Large Cap Growth Fund and has continuously owned the shares in the Large Cap Growth Fund since at least September 2014.

25.     Plaintiff Casey Leblanc, a resident of the State of California, is a shareholder in the Value Advantage Fund and has continuously owned the shares in the Value Advantage Fund since at least September 2014.

26.      Plaintiff Jacqueline Peiffer, a resident of the State of New York, is a shareholder in the Mid Cap Value Fund, Value Advantage Fund and US Equity Fund and has continuously owned the shares in the Mid Cap Value Fund since at least September 2014, the Value Advantage Fund since at least March 24, 2005, and the US Equity Fund since at least September 2014.

27.     Plaintiff Joseph Lipovich, a resident of the State of Florida, is a shareholder in the Strategic Opportunities Fund and has continuously owned the shares in the Strategic Opportunities Fund since at least September 2014.

28.     Plaintiff the Valderrama Family Trust, a trust organized under the laws of the State of California, is a shareholder in the US Equity Fund and has continuously owned the

5

shares in the US Equity Fund since at least September 2014.

29.     Defendant JPMIM is a corporation organized under Delaware law.  JPMIM is a subsidiary of the global financial services firm JPMorgan Chase & Co. ("JPMorgan Chase").

30.     JPMIM maintains offices within this judicial district at 1111 Polaris Parkway, Columbus, Ohio, and 8044 Montgomery Road, Cincinnati, Ohio.

31.     Defendant JPMFM is a Delaware corporation and is an affiliate of JPMIM. JPMFM is a subsidiary of JPMorgan Chase.

32.     JPMFM has a principal place of business in this district at 460 Polaris Parkway, Westerville, Ohio.

33.     Defendant JPMCB is a national banking association.  JPMCB is a subsidiary of JPMorgan Chase and an affiliate of JPMIM.

34.     JPMCB maintains an office within this judicial district at 1111 Polaris Parkway, Columbus, Ohio.

## THE FUNDS' ORGANIZATION AND OPERATIONS

35.     Each of the Funds is an open-end management investment company, also known as a "mutual fund," registered under the 1940 Act.

36.     The Value Advantage Fund, Strategic Opportunities Fund and US Equity Fund are organized as a series within JP Morgan TRUST I ("TRUST I"), which is a statutory trust formed under Delaware law pursuant to a Declaration of Trust, dated November 5, 2004. TRUST I consists of over 100 mutual funds, including the Value Advantage Fund, Strategic Opportunities Fund and US Equity Fund.

37.     The Large Cap Growth Fund is organized as a series within JPMorgan TRUST II ("TRUST II"), which is a statutory trust formed under Delaware law pursuant to a Declaration of

Trust, dated November 5, 2004.  TRUST II consists of over 30 mutual funds, including the Large Cap Growth Fund.

38.     The Mid Cap Value Fund is a series of the J.P. Morgan Fleming Mutual Fund Group, Inc. (the "Fleming Group"), a diversified open-end management investment company which was organized as a Maryland corporation on August 19, 1997.

39.     The over 160 mutual funds comprising TRUST I, TRUST II and the Fleming Group are collectively referred herein as the "JP Mutual Funds."

40.     As mutual funds, the Funds are collective investments that pool money of investors and invest the money in a portfolio of securities.

41.     Each Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund.  Each share issued by a Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

42.     The Funds do not have employees or facilities of their own.  The Funds' operations are conducted by external service providers pursuant to contracts.

43.     Defendant JPMIM serves as each Fund's investment adviser and, in that capacity, is responsible for managing each Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the portfolio.

44.     Defendant JPMFM serves as each Fund's administrator and, in that capacity, is responsible for providing fund administration services to the Funds.

45.     Defendant JPMCB serves as each Fund's sub-administrator and, in that capacity, is responsible for providing fund administration services to the Funds.

46.     Other service providers, including certain of Defendants' affiliates, provide other

services to the Funds and their shareholders, such as communicating with shareholders about the Funds, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders.

47. The Funds are overseen by a Board of Trustees (the "Board"), which is responsible for selecting and monitoring the Fund's service providers, among other things.

48. The same Board oversees each of the Funds and more than 160 other mutual funds managed by JPMIM or its affiliates. The more than 160 mutual funds managed by JPMIM are referred herein as the "JP Mutual Funds."

## DEFENDANT JPMIM'S INVESTMENT ADVISORY SERVICES TO THE ADVISORY CLAIM FUNDS

49. Defendant JPMIM serves as investment adviser to the Value Advantage Fund pursuant to an Investment Advisory Agreement between JPMIM and TRUST I (the "TRUST I IAA"), initially dated August 10, 2006, and most recently amended on February 19, 2015.

50. Defendant JPMIM serves as investment adviser to the Large Cap Growth Fund pursuant to an Investment Advisory Agreement between JPMIM and TRUST II (the "TRUST II IAA"), initially dated August 12, 2004, and most recently amended on December 31, 2009.

51. Defendant JPMIM serves as investment adviser to the Mid Cap Value Fund pursuant to an Investment Advisory Agreement between JPMIM and the Fleming Group (the "Mid Cap Value IAA"), initially dated December 27, 2000, and most recently amended on December 23, 2004.

52. The TRUST I IAA, TRUST II IAA and Mid Cap Value IAA contain substantially the same terms and are collectively referred to herein as the "IAAs."

53. The IAAs require JPMIM to provide investment advisory services to each of the Advisory Claim Funds, including: (a) "provid[ing] . . . a continuous investment program" for the

8

Fund; (b) "investment research and management with respect to all securities and investments and cash equivalents" in the Fund's investment portfolio; (c) "determin[ing] . . . from time to time what securities and other investments will be purchased, retained or sold by the Fund"; and (d) "plac[ing] . . . orders for purchase and sale on behalf of the Fund."

54.     The IAAs require JPMIM to maintain certain books and records relating to its investment advisory services to each of the Advisory Claim Funds.

55.     Each Advisory Claim Funds' prospectus, filed with the SEC annually, provides additional information about the investment advisory services provided by JPMIM to the Advisory Claim Funds, including each Advisory Claim Fund's investment objective, the types of securities in which each Advisory Claim Fund invests, and the strategies employed by JPMIM in managing each Advisory Claim Fund.

### Mid Cap Value Fund

56.     According to the Mid Cap Value Fund's prospectus filed with the SEC on November 1, 2014 (the "Mid Cap Value Fund Prospectus"), JPMIM invests the Mid Cap Value's portfolio in equity securities, including common stock and real estate investment trusts ("REITs"), of mid-cap companies with market capitalization equal to those within the universe of the Russell Midcap Value Index and/or between $1 billion and $20 billion ("mid cap").

57.     The Mid Cap Value Fund Prospectus further states that JPMIM will employ the following investment strategies in managing the Mid Cap Value Fund:

> the adviser employs a bottom-up approach to stock selection, constructing portfolios based on company fundamentals, quantitative screening and proprietary fundamental analysis. The adviser looks for quality companies, which appear to be undervalued and to have the potential to grow intrinsic value per share. Quality companies generally have a sustainable competitive position, relatively lower levels of business cyclicality, high returns on invested capital and strong experienced management teams.

58.   The lead portfolio managers for the Mid Cap Value Fund are Jonathan K.L. Simon, Lawrence E. Playford and Gloria H. Fu. These lead portfolio managers are principally responsible for JPMIM's investment advisory services to the Mid Cap Value Fund.

**Large Cap Growth Fund**

59.   According to the Large Cap Growth Fund's prospectus filed with the SEC on November 5, 2014 (the "Large Cap Growth Fund Prospectus"), JPMIM invests the Large Cap Growth Fund's portfolio in equity securities of large, well-established companies with market capitalizations equal to those within the universe of the Russell 1000® Growth.

60.   The Large Cap Growth Fund Prospectus further states that JPMIM will employ the following investment strategies in managing the Large Cap Growth Fund:

> The adviser employs a fundamental bottom-up approach that seeks to identify companies with positive price momentum and attractive fundamental dynamics. The adviser seeks structural disconnects which allow businesses to exceed market expectations. These disconnects may result from: demographic/cultural changes, technological advancements and/or regulatory changes. The adviser seeks to identify long-term imbalances in supply and demand.

61.   The lead portfolio manager for the Large Cap Growth Fund is Giri Devulapally, who is principally responsible for JPMIM's investment advisory services to the Large Cap Growth Fund.

**Value Advantage Fund**

62.   According to the Value Advantage Fund's prospectus filed with the SEC on November 1, 2014 (the "Value Advantage Fund's Prospectus"), JPMIM invests the Value Advantage Fund's portfolio in equity securities, including common stock and real estate investment trusts (REITs), across all market capitalizations.

63.     The Value Advantage Fund's Prospectus further states that JPMIM will employ the following investment strategies in managing the Value Advantage Fund:

> The adviser employs a bottom-up approach to stock selection, constructing portfolios based on company fundamentals and proprietary fundamental analysis. The adviser's aim is to identify undervalued companies that have the potential to grow their intrinsic values per share and to purchase these companies at a discount.

64.     The lead portfolio managers for the Value Advantage Fund are Jonathan K.L. Simon, Lawrence E. Playford and Gloria H. Fu.  These lead portfolio managers are principally responsible for JPMIM's investment advisory services to the Value Advantage Fund.

65.     In providing investment advisory services to the Advisory Claim Funds, JPMIM must comply with the 1940 Act and related rules and regulations issued by the SEC, as well as with various provisions of federal tax law.

66.     The portfolio managers for each of the Advisory Claim Funds are supported by a staff of legal, compliance, and administrative personnel, which is responsible for ensuring that JPMIM's investment advisory services comply with applicable law, including the 1940 Act, and for maintaining books and records relating to JPMIM's provision of investment advisory services to the Advisory Claim Funds.

## INVESTMENT ADVISORY FEES CHARGED
## TO AND PAID BY THE ADVISORY CLAIM FUNDS

67.     In exchange for the investment advisory services provided by Defendant JPMIM to the Advisory Claim Funds, the IAAs require each of the Advisory Claim Funds to pay JPMIM an annual fee that is calculated as a percentage of each of the Advisory Claim Fund's assets under management or "AUM."

68.     The investment advisory fee rates charged to each of the Advisory Claim Funds by JPMIM pursuant to the IAAs are as follows:

11

| Fund | Investment Advisory Rate |
|------|--------------------------|
| Mid Cap Value Fund | 0.65% |
| Large Cap Growth Fund | 0.50% |
| Value Advantage Fund | 0.65% |

69.    The following table sets forth the amount of investment advisory fees charged to each of the Advisory Claim Funds by JPMIM pursuant to the IAAs for the most recent fiscal year and each of the Advisory Claim Fund's effective investment advisory fee rate after waivers and reimbursements for that year.

| Fund | Investment Advisory Fees | Effective Investment Advisory Fee Rate |
|------|--------------------------|----------------------------------------|
| Mid Cap Value Fund | $96,920,000 | 0.61% |
| Large Cap Growth Fund | $76,760,000 | 0.50% |
| Value Advantage Fund | $59,743,000 | 0.62% |
| **Total** | **$233,423,000** | |

**DEFENDANT JPMIM PROVIDES THE SAME OR SUBSTANTIALLY
THE SAME INVESTMENT ADVISORY SERVICES TO SUBADVISED FUNDS FOR
LOWER FEES**

70.    JPMIM provides investment advisory services to unaffiliated persons or entities, including mutual funds.

71.    Those unaffiliated mutual funds include the following:  (a) LVIP JPMorgan Mid Cap Value RPM Fund (the "LVIP Mid Cap Value Fund"); (b) VY JPMorgan Mid Cap Value Portfolio (the "VY Mid Cap Value Fund"); (c) Transamerica JPMorgan Mid Cap Value VP (the "Transamerica Mid Cap Value Fund"); (d) Great West/Multi-Manager Large Cap Growth Fund (the "Subadvised Large Cap Growth Fund"); and (e) Pacific Select Fund JPMorgan Value Advantage Portfolio (the "Subadvised Value Advantage Fund").  These funds are collectively referred to herein as the "Subadvised Funds."

72. Each of the Subadvised Funds was organized and sponsored by a financial institution independent of JPMIM.

73. Like the Advisory Claim Funds, each of the Subadvised Funds is an open-end management investment company and is registered under the 1940 Act.

74. Like the Advisory Claim Funds, each of the Subadvised Funds is part of a business trust or corporation organized under state law.

75. Like the Advisory Claim Funds, each of the Subadvised Funds issues shares to investors who invest money in the fund, and each share represents, and may be redeemed for, a *pro rata* interest in the Subadvised Funds' underlying portfolio of securities (less any fees and other liabilities).

76. The Subadvised Funds' financial institution sponsors nominally serve as those funds' investment advisers which have investment advisory contracts with those funds, and receive investment advisory fees from the funds.

77. Each of the financial institution sponsors has subcontracted with JPMIM to provide investment advisory services to the Subadvised Funds. Pursuant to subadvisory agreements between JPMIM and each of the financial institution sponsors ("Subadvisory Agreements"), JPMIM is the subadviser and provides investment advisory services to each of the Subadvised Funds in exchange for a fee.

78. The fees that JPMIM receives for providing investment advisory services to the Subadvised Funds are paid by the financial institution sponsors of those funds.

79. The investment advisory services that JPMIM provides as subadviser to the Subadvised Funds are the same or substantially the same as the services JPMIM provides to the Advisory Claim Funds pursuant to the IAAs.

80.     The Subadvisory Agreements require JPMIM to provide the same or substantially the same types of investment advisory services as are required by the Advisory Claim Funds' IAAs.  For example, like the Advisory Claim Funds' IAAs, the Subadvisory Agreement for the VY Mid Cap Value Fund requires JPMIM to:  (a) "implement a continuing program for the management" of the VY Mid Cap Value Fund; (b) "provide investment research" to the VY Mid Cap Value Fund; (c) "shall supervise and direct the investments" of the VY Mid Cap Value Fund "in accordance with its investment objective, policies and restrictions as provided [in the Prospectus]"; and (d) "place orders" for the purchase and sale securities and the other investments on behalf of the VY Mid Cap Value Fund.

81.     Like the Advisory Claim Funds' IAAs, the Subadvisory Agreements require JPMIM to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds.

### Subadvised Mid Cap Value Funds

82.     Defendant JPMIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the LVIP Mid Cap Value Fund, the VY Mid Cap Value Fund, and the Transamerica Mid Cap Value Fund (collectively, the "Subadvised Mid Cap Value Funds") as it does on behalf of the Mid Cap Value Fund.  For example, the following chart compares the Mid Cap Value Fund Prospectus to the prospectus for the LVIP Mid Cap Value Fund filed April 30, 2015 and shows that the services provided are substantively identical:

|  | **Mid Cap Value Fund** | **LVIP Mid Cap Value Fund** |
|---|---|---|
| Investment Objective | seeks growth from capital appreciation | seeks long-term capital appreciation |

|  | Mid Cap Value Fund | LVIP Mid Cap Value Fund |
|---|---|---|
| Types of Securities | invest in equity securities of mid cap companies similar to those the universe of the Russell Midcap Value Index<br><br>investments are primarily in common stocks and real estate investment trusts (REITs)<br><br>the Fund will primarily use futures contracts to more effectively gain targeted equity exposure from its cash positions | invest in equity securities of mid cap companies similar to those the universe of the Russell Midcap Value Index<br><br>investments are primarily in common stocks and real estate investment trusts (REITs)<br><br>sub-adviser will primarily use futures contracts to more effectively gain targeted equity exposure from its cash positions |
| Investment Strategies | Adviser "employs a bottom-up approach to stock selection, constructing portfolios based on company fundamentals, quantitative screening and proprietary fundamental analysis. The adviser looks for quality companies, which appear to be undervalued and to have the potential to grow intrinsic value per share. Quality companies generally have a sustainable competitive position, relatively lower levels of business cyclicality, high returns on invested capital and strong experienced management teams" | Sub-adviser "employs a bottom-up approach to stock selection, constructing portfolios based on company fundamentals, quantitative screening and proprietary fundamental analysis. The adviser looks for quality companies, which appear to be undervalued and to have the potential to grow intrinsic value per share. Quality companies generally have a sustainable competitive position, relatively lower levels of business cyclicality, high returns on invested capital and strong experienced management teams" |

83.    The Mid Cap Value Fund and the Subadvised Mid Cap Value Funds are managed by the same portfolio managers, Jonathan K.L. Simon, Lawrence E. Playford and Gloria H. Fu.

84.    The portfolio managers of the Mid Cap Value Fund use the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Mid Cap Value Funds as they use in providing investment advisory services to the Mid Cap Value Fund.

15

**Subadvised Large Cap Growth Fund**

85.    Defendant JPMIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the Subadvised Large Cap Growth Fund, as it does on behalf of the Large Cap Growth Fund.  The following chart compares the Large Cap Growth Fund Prospectus to the prospectus for the Subadvised Large Cap Growth Fund filed on April 30, 2015, and shows that the services provided are the same:

|  | **Large Cap Growth Fund** | **Subadvised Large Cap Growth Fund** |
|---|---|---|
| Investment Objectives | seeks long-term capital appreciation | seeks long-term capital appreciation and growth of income |
| Types of Securities | invest at least 80% of its assets in the equity securities of large, well-established with market-capitalizations equal to those within the universe of the Russell 1000 Growth Index<br><br>may invest in derivatives | invest primarily in equity securities of large, well-established companies with market-capitalization equal to those within the universe of the Russell 1000 Growth Index<br><br>may invest in derivatives |

|  | Large Cap Growth Fund | Subadvised Large Cap Growth Fund |
|---|---|---|
| Investment Strategies | "the adviser employs a fundamental bottom-up approach that seeks to identify companies with positive price momentum and attractive fundamental dynamics" | Subavisor "employs a fundamental bottom-up approach that seeks to identify companies with positive price momentum and attractive fundamental dynamics" |
|  | "The adviser seeks structural disconnects which allow businesses to exceed market expectations. These disconnects may result from: demographic/cultural changes, technological advancements and/or regulatory changes" | Subadvisor "seeks structural disconnects which it believes allow businesses to exceed market expectations. These disconnects may result from: demographic/cultural changes, technological advancements and/or regulatory changes" |
|  | "The adviser seeks to identify long-term imbalances in supply and demand" | Subadvisor "seeks to identify long-term imbalances in supply and demand" |

86.    The Large Cap Growth Fund and the Subadvised Large Cap Growth Fund are managed by the same portfolio manager, Giri Devulapally.

87.    The portfolio manager of the Large Cap Growth Fund uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Large Cap Growth Fund as he uses in providing investment advisory services to the Large Cap Growth Fund.

**Subadvised Value Advantage Fund**

88.    Defendant JPMIM employs the same or substantially the same investment strategies and invests in the same or substantially the same type of securities on behalf of the Subadvised Value Advantage Fund as it does on behalf of the Value Advantage Fund.  The following chart compares the Value Advantage Fund Prospectus to the prospectus for the

Subadvised Value Advantage Fund filed on April 24, 2015, and shows that the services provided are the same:

|  | Value Advantage Fund | Subadvised Value Advantage Fund |
|---|---|---|
| Investment Objectives | seeks to provide long-term total return from a combination of income and capital gains | seeks to provide long-term total return from a combination of income and capital gains |
| Types of Securities | invest primarily in equity securities across all market capitalizations.<br><br>equity securities in which the Fund primarily invests include common stocks and real estate investment trusts ("REITs").<br><br>may use derivatives, including future contracts | invest primarily in equity securities across all market capitalizations<br><br>equity securities in which the Fund primarily invests include common stocks and REITs<br><br>may use derivatives, including future contracts |
| Investment Strategies | "adviser employs a bottom-up approach to stock selection, constructing portfolios based on company fundamentals and proprietary fundamental analysis. The adviser's aim is to identify undervalued companies that have the potential to grow their intrinsic values per share and to purchase these companies at a discount" | "sub-adviser employs a bottom-up approach to stock selection, constructing portfolios based on company fundamentals and proprietary fundamental analysis. The sub-adviser's aim is to identify undervalued companies that have the potential to grow their intrinsic values per share and to purchase these companies at a discount" |

89.     The Value Advantage Fund and the Subadvised Value Advantage Fund are managed by the same portfolio managers, Jonathan K.L. Simon, Lawrence E. Playford and Gloria H. Fu.

90.     The portfolio managers of the Value Advantage Fund use the same or substantially the same investment strategies, research and analysis, and systems, technology, and

other resources in providing investment advisory services to the Subadvised Value Advantage Fund as they use in providing investment advisory services to the Value Advantage Fund.

91.     In providing investment advisory services to the Subadvised Funds, JPMIM must comply with the same or substantially the same provisions of the 1940 Act, SEC regulations, and federal tax law as when it provides investment advisory services to the Advisory Claim Funds.

92.     The same or substantially the same legal, compliance, and administrative personnel, who are responsible for ensuring that JPMIM's investment advisory services provided to the Subadvised funds, comply with applicable law and for maintaining books and records, are the same personnel responsible for the same services provided to the Advisory Claim Funds. They use the same or substantially the same systems, technology, and other resources in performing those tasks for the Subadvised Funds as they use for the Advisory Claim Funds.

**THE ADVISORY CLAIM FUNDS PAY HIGHER INVESTMENT ADVISORY FEES THAN THE SUBADVISED FUNDS FOR JPMIM'S INVESTMENT ADVISORY SERVICES**

93.     The fees that Defendant JPMIM receives for providing investment advisory services to the Subadvised Management Fee Funds are lower than the fees paid by the Advisory Claim Funds to JPMIM for the same or substantially the same services.

**Mid Cap Value Fund**

94.     The Mid Cap Value Fund's effective investment advisory fee rate of 59% basis points on all AUM is as much as 47.5% higher than the fee rate paid on behalf of the Subadvised Mid Cap Value Funds.

| Fund | Fee Rate | Difference (%) |
|------|----------|----------------|
| Mid Cap Value Fund | 0.59% on all AUM | |
| LVIP Mid Cap Value Fund | 0.47% on all AUM | 25.5% |
| VY Mid Cap Value Fund | 0.55% on AUM up to $50 million; 0.50% on AUM from $50 million to $100 million; and and 0.45% on AUM over $100 million | 7.3% - 31.1% |
| Transamerica Mid Cap Value Fund | 40% on all AUM | 47.50% |

95.    If the Mid Cap Value Fund's investment advisory fees were calculated using the fee rate for the Subadvised Mid Cap Value Funds, the Mid Cap Value Fund would pay up to $28.5 million less in fees annually at current asset levels (approximately $15B billion in AUM).

| Fee Schedule | Fees Paid (at $15B in AUM) | Difference ($) |
|--------------|----------------------------|----------------|
| Mid Cap Value Fund | $88,500,000 | |
| LVIP Mid Cap Value Fund | $70,500,000 | $18,000,000 |
| VY Mid Cap Value Fund | $67,575,000 | $20,925,000 |
| Transamerica Mid Cap Value Fund | $60,000,000 | $28,500,000 |

**Large Cap Growth Fund**

96.    The Large Cap Growth Fund's effective investment advisory fee rate of 49 basis points on all AUM is as much as 63% higher that the fee rate paid on behalf of the Subadvised Large Cap Growth Fund.

| Fund | Fee Rate | Difference (%) |
|------|----------|----------------|
| Large Cap Growth Fund | 0.49% on all AUM | |
| Subadvised Large Cap Growth Fund | 0.35% on AUM up to $500M; and 0.30% on AUM over $500M | 40% -63% |

97.    If the Large Cap Growth Fund's investment advisory fees were calculated using the fee rate for the Subadvised Large Cap Growth Fund, the Large Cap Growth Fund would pay up to $28.3 million less in fees annually at current asset levels (approximately $15 billion in AUM).

| Fee Schedule | Fees Paid (at $15B in AUM) | Difference ($) |
|---|---|---|
| Large Cap Growth Fund | $73,500,000 | |
| Subadvised Large Cap Growth Fund | $45,250,000 | $28,250,000 |

**Value Advantage Fund**

98.    The Value Advantage Fund's effective investment advisory rate of 61 basis points on all AUM is as much as 69% higher than the fee rate paid on behalf of the Subadvised Value Advantage.

| Fund | Fee Rate | Difference (%) |
|---|---|---|
| Value Advantage Fund | 0.61% on all AUM | |
| Subadvised Value Advantage Value | 0.36% on all AUM | 69% |

99.    If the Value Advantage Fund's investment advisory fees were calculated using the fee rate for the Subadvised Value Advantage Fund, the Value Advantage Fund would pay up to $27.5 million less in fees annually at current asset levels (approximately $11 billion in AUM).

| Fee Schedule | Fees Paid (at $11B in AUM) | Difference ($) |
|---|---|---|
| Value Advantage Fund | $67,100,000 | |
| Subadvised Value Advantage Value | $39,600,000 | $27,500,000 |

100.    The higher fees paid by the Advisory Claim Funds to Defendant JPMIM pursuant to the IAAs, as set forth in the preceding paragraphs, are not justified by any additional services provided to the Advisory Claim Funds by JPMIM or its affiliates.

101.    Insofar as Defendant JPMIM or its affiliates provide other services to the Advisory Claim Funds, other than the investment advisory services set forth above, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid to Defendant JPMIM under the IAAs.

## DEFENDANT JPMIM HAS NOT ADEQUATELY SHARED THE BENEFITS OF ECONOMIES OF SCALE WITH THE ADVISORY CLAIM FUNDS

102.    The Mid Cap Value Fund's AUM increased from less than $5.8 billion as of the end of fiscal year 2008 to more than $15.9 billion at the end of the most recently reported fiscal year ended June 30, 2015.  As of August 31, 2015, the Fund's AUM were approximately $15 billion.

103.    As a result of the increase in AUM, the amount of investment advisory fees paid by the Mid Cap Value Fund increased by more than 154%, from less than $38.2 million in fiscal year 2008 to more than $97  million in fiscal year 2015.

104.    The Large Cap Growth Fund's AUM increased from less than $910 million as of the end of fiscal year 2008 to more than $15.6 billion at the end of the most recently reported fiscal year ended June 30, 2015.  As of August 31, 2015, the Fund's AUM were approximately $15 billion.

105.    As a result of the increase in AUM, the amount of investment advisory fees paid by the Large Cap Growth Fund increased by more than 1441%, from less than $5 million in fiscal year 2008 to more than $77 million in fiscal year 2015.

106.    The Value Advantage Fund's AUM increased from less than $404 million as of the end of fiscal year 2008 to more than $11.3 billion at the end of the most recently reported fiscal year ended June 30, 2015.  As of August 31, 2015, the Fund's AUM were approximately $11 billion.

107.    As a result of the increase in AUM, the amount of investment advisory fees paid by the Value Advantage Fund increased by more than 2279%, from less than $2.5 million in fiscal year 2008 to more than $59.7 million in fiscal year 2014.

108.    The increases in investment advisory fees paid to Defendant JPMIM by each of the Advisory Claim Funds as detailed in the preceding paragraphs were not accompanied by a proportionate increase in the work or cost required by Defendant JPMIM to provide investment advisory services to the Advisory Claim Funds.

109.    Defendant JPMIM realized economies of scale as the Advisory Claims Funds' AUM increased, which reduced the cost, as a percentage of the Advisory Claim Funds' AUM, of providing investment advisory services to each Advisory Claim Fund, and increased the profitability to JPMIM of providing those services.

110.    Because investment advisers realize economies of scale as AUM increase, mutual fund investment advisory fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase.

111.    For example, the fee rate paid to JPMIM for providing investment advisory services to the VY Mid Cap Value Fund is 55 basis points (or 0.55%) on the first $50 million in AUM; 50 basis points (or 0.50%) on the next $50 million in AUM; and 45 basis points (or 0.45%) on AUM greater than $100 million.

112.    Breakpoints enable a fund to share in the benefits of economies of scale by reducing the fee rate it pays as AUM increase.

113.    Absent breakpoints, or if the breakpoints do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits.

114.    The Advisory Claim Funds' investment advisory fee schedules do not include any breakpoints, and the investment advisory fee rates paid by each Advisory Claim Fund remain the same regardless of the amount of the Advisory Claim Funds' AUM.

115.    The investment advisory fee rates charged to and paid by the Advisory Claim Funds have not allowed the Advisory Claim Funds to appropriately benefit from economies of scale as the  Advisory Claim Funds' AUM have increased in recent years.

## DEFENDANT JPMFM'S AND JPMCB'S ADMINISTRATION
## SERVICES TO THE FUNDS

116.    JPMFM serves as the administrator to the Funds, pursuant to the Administration Agreement dated February 19, 2005, as most recently amended on June 21, 2012 (the "JPMorgan Administration Agreement").

117.    The Administration Agreement requires JPMFM to provide each of the Funds the following services:

      a.    **Financial Reporting and Accounting Services**, including preparing the Funds' annual and semi-annual financial statements; preparing budgets and managing the Funds' expenses; and coordinating annual audit activities;

      b.    **Tax Services**, including preparing and filing the Funds' federal and state returns; monitoring the Funds' compliance with various tax rules and regulations;

      c.    **Compliance Services,** including monitoring each Fund's compliance with its investment guidelines and other regulatory requirements; and assisting the Trust's Chief Compliance Officer with the Trust's compliance program;

      d.    **Fund Governance**, including providing reports, evaluations, information, analyses and materials to the Board; providing personnel for Board meetings; preparing and maintaining the Trust's governing documents; and providing assistance with respect to shareholder meetings for the Funds;

      e.    **Regulatory Affairs**, including arranging for filing and dissemination of the Fund's regulatory filings and disclosure materials; and assisting with examinations or inspections by the SEC and other regulators; and

f. **General Administrative Services**, including furnishing the Funds with office facilities, equipment and personnel; preparing and administering contracts with the Funds' transfer agent, shareholder servicing agent, custodian, and other service providers.

118.    Pursuant to the JPMorgan Administration Agreement, JPMFM may subcontract with other entities or persons to provide administration services.

119.    JPMCB serves as the Funds' sub-administrator and receives a portion of the fees paid to JPMFM.

### ADMINISTRATION FEES CHARGED TO AND PAID BY THE FUNDS

120.    In exchange for the administration services provided by JPMFM to the Funds, the Administration Agreement requires each Fund to pay JPMFM an annual fee.  The administration fee is calculated as percentage of each Fund's AUM with breakpoints based on the combined AUM of all of the funds of the JP Mutual Funds.

121.    For the most recent fiscal year, JPMFM charges the Funds more than $36.9 million in administration fees.  The following table sets forth the amount of administration fees charged and the effective management fee rate (after waivers and reimbursements) for each of the Funds:

| Funds | Administration Fees | Effective Net Administration Fee Rate |
|---|---|---|
| Mid Cap Value Fund | $8,795,000 | 0.055% |
| Large Cap Growth Fund | $12,653,000 | 0.082% |
| Value Advantage Fund | $6,136,000 | 0.063% |
| Strategic Income Opportunities Fund | $13,701,000 | 0.053% |
| US Equity Fund | $9,762,000 | 0.081% |
| **Total** | **$51,047,000** | |

122.     JPMCB receives a portion of the administration fees paid to JPMFM by the Funds.

123.     In addition to the administration fees, the JPMorgan Administration Agreement requires each Fund to pay (or to reimburse JPMFM for) many of the costs associated with the administration services provided to the Funds.  For example, the JPMorgan Administration Agreement requires the Funds to pay (or to reimburse JPMFM for): (a) organization costs; (b) fees and expenses for legal and auditing services; (c) the expenses of preparing (including typesetting), printing and mailing reports, prospectuses, statements of additional information, proxy solicitation material, and notices to existing shareholders; (d) the cost of initial and ongoing registration of the shares under Federal and state securities laws; and (e) reasonable out-of-pocket expenses, including the travel and lodging expenses incurred by officers and employees of JPMFM in connection with attendance at Board meetings.

### THE ADMINISTRATION FEES CHARGED TO THE FUNDS ARE HIGHER THAT THOSE CHARGED TO UNAFFILIATED CLIENTS

124.     JPMorgan Chase through its subsidiaries, including JPMFM, JPMCB, and J.P. Morgan Investor Services Co. ("JPMIS"), provides fund administration services to the Funds and to unaffiliated mutual funds.     Those unaffiliated mutual funds include ProShares Trust (the "ProShares Funds") and EQ Advisors Trust (the "EQ Funds" and collectively referred as the "Unaffiliated Funds").

125.     JPMIS provides fund administration services to the ProShares Funds pursuant to a Fund Services Agreement between ProShares Trust and JPMIS dated June 16, 2006, as amended on December 30, 2011 (the "ProShares Funds Agreement").

126.     JPMCB provides fund administration services to the EQ Funds pursuant to a Mutual Funds Sub-Administration Agreement between AXA Equitable Funds Management

Group, LLC and JPMCB dated May 1, 2011 (the "EQ Funds Agreement").

127. As shown in the chart attached as Exhibit A, the administration services provided to the ProShares Funds and the EQ Funds pursuant to the ProShares Funds Agreement and the EQ Funds Agreement, respectively, are the same or substantially the same as administration services provided to the Funds pursuant to the JPMorgan Administration Agreement.

128. JPMCB and JPMIS use the same or substantially the same systems, technology, personnel and other resources in performing fund administration services for the Unaffiliated Funds as JPMFM uses in performing the same or substantially the same services for the Funds.

129. In addition to the fund administration services described above, JPMCB and JPMIS provide additional services to the Unaffiliated Funds that are not provided to the Funds to the JPMorgan Administration Agreement.

130. The ProShares Funds Agreement and the EQ Funds Agreement require JPMIS and JPMCB, respectively, to provide trust and fund accounting services to the Unaffiliated Funds, including maintaining records of the funds' assets, calculating each fund's Net Asset Value, and accounting for dividend and interest income received by the funds.

131. In contrast, JPMCB provides trust and accounting services to the Funds pursuant to an Amended and Restated Global Custody and Fund Accounting Agreement dated September 1, 2010 (the "JPMorgan Fund Accounting Agreement").

132. The JPMorgan Fund Accounting Agreement requires the Funds to pay a fee to JPMCB for fund accounting services, which is separate from and in addition to the administration fee charged pursuant to the JPMorgan Administration Agreement.

133. Notwithstanding that the ProShares Funds Agreement and the EQ Funds Agreement require JPMIS and JPMCB additional services, the fees that JPMCB and JPMIS

receive from the Unaffiliated Funds are lower than the fees paid by the Funds to JPMFM pursuant to the JPMorgan Administration Agreement.

134.    Pursuant to the ProShares Funds Agreement, the administration fee rates charged to each ProShares Fund is a $18,000 annual fixed fee plus and asset-based fee of: 15 basis points (or 0.15%) on the first $50 million in AUM; 5 basis points (or 0.05%) on the next $50 million in AUM; 3 basis points (or 0.03%) on the next $150 million; 2 basis point (or 0.02%) on the next $500 million in AUM; and 0.25 basis points (or 0.0025%) on AUM greater than $1 billion.

135.    If the Funds' administration fees were calculated using the fee schedule for the ProShares Funds, the Funds would pay approximately $48 million less in administration fees annually at asset levels as of the end of fiscal year 2015, as shown in the following chart:

| Funds | Fees Paid per JPMorgan Administration Agreement | Fee Paid per ProShares Funds Agreement | Difference |
|---|---|---|---|
| Mid Cap Value Fund | $8,795,000 | $686,000 | $8,109,000 |
| Large Cap Growth Fund | $12,653,000 | $673,000 | $11,980,000 |
| Value Advantage Fund | $6,136,000 | $530,000 | $5,606,000 |
| Strategic Income Opportunities | $13,701,000 | $930,000 | $12,771,000 |
| US Equity Fund | $9,762,000 | $590,000 | $9,172,000 |
| **Total** | **$51,047,000** | **$3,409,000** | **$47,638,000** |

136.    Pursuant to the EQ Funds Agreement, the administration fee charged to each EQ Funds is a $20,000 fixed annual fee for funds assets greater than $100 million plus an asset-based fee of: 1.5 basis points (or 0.0150%) on the first $3 billion in AUM; 1.25 basis points (or 0.0125%) on the next $3 billion in AUM; 1 basis points (or 0.010%) on the next $4 billion; and .75 basis point (or 0.0075%) on AUM greater than $10 billion.

137. If the Funds' administration fees were calculated using the fee schedule for the EQ Funds, the Funds would pay approximately $42.9 million less in administration fees annually at asset levels as of the end of fiscal year 2015, as shown in the following chart:

| Funds | Fees Paid per JPMorgan Administration Agreement | Fee Paid per EQ Funds Agreement | Difference (%) |
|---|---|---|---|
| Mid Cap Value Fund | $8,795,000 | $1,689,000 | $7,106,000 |
| Large Cap Growth Fund | $12,653,000 | $1,649,000 | $11,004,000 |
| Value Advantage Fund | $6,136,000 | $1,306,000 | $4,830,000 |
| Strategic Income Opportunities | $13,701,000 | $2,421,000 | $11,280,000 |
| US Equity Fund | $9,762,000 | $1,453,000 | $8,309,000 |
| **Total** | **$51,047,000** | **$8,518,000** | **$42,529,000** |

138. The higher administration fees paid by the Funds to JPMFM pursuant to the JPMorgan Administration Agreement as set forth in the preceding paragraphs are not justified by any additional services provided to the Funds by JPMFM or its affiliates.

139. As noted, above the ProShares Funds Agreement and the EQ Funds Agreement require JPMIS and JPMCB, respectively, to provide trust and fund accounting services to the Unaffiliated Funds in exchange for the administration fees paid by those funds, whereas JPMCB receives separate compensation (in addition to the administration fees paid by the Funds to JPMFM pursuant to the JPMorgan Administration Agreement) for providing accounting services to the Funds.

140. Insofar as JPMFM provides any services pursuant to the JPMorgan Administration Agreement that are not provided to the ProShares Funds or the EQ Funds, such services are *de minimis* and do not justify the more than $42.9 million in additional administration fees paid by the Funds to JPMFM each year.

30

## THE ADMINISTRATION FEES CHARGED TO THE FUNDS ARE HIGHER THAN THOSE CHARGED BY OTHER ADMINISTRATORS

141.    Other administrators provide fund administration services to unaffiliated mutual funds that are the same or substantially the same as the services provided to the Funds pursuant to the JPMorgan Administration Agreement.  The other administrators include State Street Bank & Trust Company ("State Street") and U.S. Bancorp Fund Services, LLC ("US Bank").

142.    The fees charged by the State Street and US Bank to unaffiliated mutual funds are negotiated at arm's length between the administrator and the funds or a representative of the funds.

143.    The fees charged by State Street and US Bank to unaffiliated mutual funds are lower than the fees charged to the Funds pursuant to the JPMorgan Administration Agreement for the same or substantially the same fund administration services.

144.    For example, State Street provides fund administration services to the Met Investors Series Trust and the Metropolitan Series Fund (together, the "MetLife Funds") pursuant to an Amended and Restated Master Administration Agreement dated October 1, 2012 (the "MetLife Funds Agreement").

145.    The MetLife Funds Agreement requires State Street to provide the same or substantially the same administration services as are provided to the Funds pursuant to the JPMorgan Administration Agreement, including financial management and reporting services, tax services, compliance services, fund governance, regulatory affairs, and general administrative services.

146.    The MetLife Funds Agreement also requires State Street to provide fund accounting services to the MetLife Funds, including calculating each fund's Net Asset Value and maintaining certain books and records.

147.    Pursuant to the MetLife Funds Agreement, the administration fee charged to each MetLife Fund is an asset based fee of 1 basis point (or 0.01%).

148.    If the Funds' administration fees were calculated using the fee schedule for the MetLife Funds, the Funds would pay approximately $43.7 million less in administration fees annually at asset levels as of the end of fiscal year 2015, as shown in the following chart:

| Funds | Fees Paid per JPMorgan Administration Agreement | Fee Paid per MetLife Funds Agreement | Difference ($) |
|---|---|---|---|
| Mid Cap Value Fund | $8,795,000 | $1,593,000 | $7,202,000 |
| Large Cap Growth Fund | $12,653,000 | $1,538,000 | $11,115,000 |
| Value Advantage Fund | $6,136,000 | $969,000 | $5,167,000 |
| Strategic Income Opportunities | $13,701,000 | $2,568,000 | $11,133,000 |
| US Equity Fund | $9,762,000 | $1,208,000 | $8,554,000 |
| **Total** | **$51,047,000** | **$7,876,000** | **$43,171,000** |

149.    US Bank provides fund administration services to the Bridge Builder Bond Fund pursuant to a Master Services Agreement between US Bank and the Bridge Builder Trust dated May 22, 2013 (the "Bridge Builder Funds Agreement").

150.    The Bridge Builder Funds Agreement requires US Bank to provide the same or substantially the same administration services as are provided to the Funds pursuant to the JPMorgan Administration Agreement, including financial management and reporting services, tax services, compliance services, fund governance, regulatory affairs, and general administrative services.

151.    Pursuant to the Bridge Builder Funds Agreement, US Bank charges the Bridge Builder Bond Fund an effective administration fee rate of approximately 1.45 basis points (or 0.0145%).

152.    If the Funds' administration fees were calculated using the fee schedule for the Bridge Builder Bond Fund, the Fund would pay approximately $40 million less in administration fees annually at asset levels as of the end of fiscal year 2015, as shown in the following chart:

| Funds | Fees Paid per JPMorgan Administration Agreement | Fee Paid per Bridge Builder Funds Agreement | Difference ($) |
|---|---|---|---|
| Mid Cap Value Fund | $8,795,000 | $2,309,000 | $6,486,000 |
| Large Cap Growth Fund | $12,653,000 | $2,231,000 | $10,422,000 |
| Value Advantage Fund | $6,136,000 | $1,405,000 | $4,731,000 |
| Strategic Income Opportunities | $13,701,000 | $3,724,000 | $9,977,000 |
| US Equity Fund | $9,762,000 | $1,751,000 | $8,011,000 |
| **Total** | **$51,047,000** | **$11,420,000** | **$39,627,000** |

**THE ADMINISTRATION FEES PAID TO JPMFM ARE DUPLICATIVE OF FEES PAID BY THE FUNDS TO OTHER SERVICE PROVIDERS**

153.    The administration services provided pursuant to the JPMorgan Administration Agreement overlap with services provided to the Funds by other entities, including certain of JPMFM's affiliates, pursuant to separate contracts and in exchange for separate fees, resulting in the Funds paying duplicative fees for those services.

154.    The Funds are subject to a Shareholder Servicing Agreement, dated February 19, 2005, with one of JPMFM's affiliates, JPMorgan Distribution Services, Inc. (the "Shareholder Servicing Agent"), which requires the Shareholder Servicing Agent to provide certain services to the Funds.

155.    The services provided by the Shareholder Servicing Agent pursuant to the Shareholder Servicing Agreement include: (a) "answering Shareholder inquiries…regarding account status and history, the manner in which purchases and redemptions of the Shares may be effected and certain other matters pertaining to the Trust"; (b) "providing Shareholders with

information through electronic means"; (c) "handling correspondence from Shareholders about their accounts"; (d) "providing Shareholders with account statements showing their purchases, sales, and positions in the applicable Fund"; (e) "forwarding communications from the Trust to Shareholders, including proxy statements and proxy solicitation materials, shareholder reports, dividend and tax notices, and updated Prospectuses and Statements of Additional Information"; and (f) "receiving, tabulating and transmitting proxies executed by Shareholders."

156. As set forth in the following table during the 2015 fiscal year, the Funds collectively paid approximately $71.9 million to the Shareholder Servicing Agent for the foregoing and other services pursuant to the Shareholder Servicing Agreement.

| Funds | Shareholder Servicing Fees |
|---|---|
| Mid Cap Value Fund | $9,219,000 |
| Large Cap Growth Fund | $19,336,000 |
| Value Advantage Fund | $9,956,000 |
| Strategic Income Opportunities | $22,353,000 |
| US Equity Fund | $11,070,000 |
| **Total** | **$71,934,000** |

157. The amounts set forth in the preceding paragraph are in addition to, and duplicative of, any amounts paid by the Funds pursuant to the JPMorgan Administration Agreement for "[p]reparing…communications to shareholders"; "[c]oordinating the mailing of prospectuses, notices, proxy statements, proxies, semi-annual and annual reports to shareholders, and other reports to Trust shareholders"; and "[s]upervis[ing] and facilitate[ing] the proxy solicitation process for all shareholder meetings, including the tabulation of shareholder votes."

158. The Funds are subject to a Transfer Agency Agreement, dated Sepetmber 1, 2009, the Boston Financial Data Service (the "Transfer Agent", which requires the Transfer Agent to provide certain services to the Funds.

159.    The services provided by the Transfer Agent pursuant to the Transfer Agency Agreement include: (a) "mailing shareholder reports and prospectus"; (b) "preparing and mailing confirmation forms to shareholders…for all purchases and liquidations of shares of the Trust"; and (c) providing information for the Funds' Blue Sky filings.

160.    As set forth in the following table during the 2015 fiscal year, the Funds paid approximately $51.4 million to the Transfer Agent for the foregoing and other services provided pursuant to the Transfer Agency Agreement.

| Funds | Transfer Agency Fees |
|---|---|
| Mid Cap Value Fund | $15,294,000 |
| Large Cap Growth Fund | $12,110,000 |
| Value Advantage Fund | $6,758,000 |
| Strategic Income Opportunities | $11,431,000 |
| US Equity Fund | $5,786,000 |
| **Total** | **$51,379,000** |

161.    The amounts set forth in the preceding paragraph are in addition to, and duplicative of, any amounts paid by the Funds pursuant to the JPMorgan Administration Agreement for "[p]reparing…communications to shareholders"; "[c]oordinating the mailing of prospectuses…semi-annual and annual reports to shareholders"; and "[p]reparing and fil[ing], or supervis[ing] the preparation and filing, of all necessary Blue Sky filings."

**THE FEES DEFENDANTS JPMIM AND JPMFM CHARGE TO THE FUNDS ARE NOT NEGOTIATED AT ARM'S LENGTH**

162.    The investment advisory fees paid by the Advisory Claim Funds under the IAAs are determined by Defendant JPMIM.  The administration service fees paid by the Funds under the JPMorgan Administration Agreement are determined by Defendant JPMFM.

163.    The Board is required to approve the IAAs, and the JPMorgan Administration Agreement and the fees paid by each of the Funds to Defendants pursuant to those agreements on

an annual basis.

164.    The Board has approved the IAAs and the JPMorgan Administration Agreement each year without devoting the time and attention necessary to independently assess the investment advisory and the administration fees paid by each of the Funds or to effectively represent the interests of Funds' shareholders *vis-à-vis* Defendants.

165.    Serving on the Board is a part-time job for the Trustees, most of whom are employed full-time in senior-level positions in management, finance, or academia, and/or serve on the boards of directors of other public and privately-held companies and institutions.

166.    The Board meets quarterly, and during the four meetings each year, the Board is required to conduct its oversight responsibilities not only for each of the Funds, but also for the more than 160 JPMorgan-managed mutual funds it oversees.    This includes approving investment advisory and other services contracts for each fund, as well as other oversight responsibilities, including, among many others, monitoring each fund's compliance with federal and state law and its stated investment policies; overseeing the daily pricing of each fund's security holdings; and approving each fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

167.    In approving the IAAs and the JPMorgan Administration Agreement, the Board has relied on information and analyses that were prepared by Defendants or were designed to support Defendants' rationalizations for the investment advisory and administration fees charged to the Funds.

168.    The Board has not considered information or analyses reflecting the interests of the Funds or their shareholders with respect to the investment advisory and administration services fees or critically assessing Defendants' rationalizations for those fees.

169.    For example, with respect to the fees paid by the Subadvised Funds and the Unaffiliated Funds, the Board has accepted Defendants' representations that the lower fees paid by those funds reflect differences in the services provided to those clients.  The Board has not appropriately examined whether the investment advisory services and administration services provided to those funds by Defendants are different from the services provided to the Funds under the IAAs and the JPMorgan Administration Agreement or the extent of any such differences.  Nor has the Board considered appropriate information about the cost to Defendants of providing any additional services required by the IAAs and the JPMorgan Administration Agreement to assess whether the difference in fees is warranted by any such differences in the services provided.

170.    The Board has approved the IAAs and the JPMorgan Administration Agreement on the terms proposed by Defendants without negotiating more favorable terms or alternative fee rates that would benefit the Funds or their shareholders.

171.    The Board has not solicited proposals from other advisers to provide investment advisory services to the Advisory Claim Funds.  The Board has not solicited proposals from other administrators to provide administration services to the Funds.

172.    The Board has not negotiated a "most favored nation" provision into the IAAs or the JPMorgan Administration Agreement, which would require that the fee rates paid by each of the Funds be at least as favorable as the lowest rate other clients pay Defendants for the same or substantially the same investment advisory and/or administration services.

173.    The Board has approved the payment by each of the Funds of investment advisory and administration fees that are higher than the fees other clients pay Defendants for the same or substantially the same investment advisory and administration services.

174.    The Board has approved investment advisory fee and administration services arrangements that enable Defendants to retain for themselves the vast majority of the benefits of economies of scale resulting from increases in each of the Funds' AUM without appropriately sharing those benefits with the Funds.

175.    JPMIM's fees for providing investment advisory services to the Subadvised Funds are negotiated by two sophisticated financial institutions:  JPMIM on the one hand and the sponsors of the Subadvised Funds on the other.

176.    The sponsors of the Subadvised Funds negotiate at arm's length with JPMIM regarding the advisory fees paid to JPMIM for providing investment advisory services to the Subadvised Funds.

177.    The Subadvised Funds' sponsors select investment advisers through a competitive selection process with multiple candidates submitting proposals.

178.    The Subadvised Funds' sponsors negotiate with investment advisers regarding the advisory fees to be charged at the outset of the relationship and when contracts are subject to renewal.  The negotiations include exchanges of proposals and counterproposals resulting in reductions in the advisory fee rates paid by the sponsors to the investment advisers.

179.    The fees for providing administration services to the Unaffiliated Funds are determined by negotiations between two sophisticated financial institutions:  JPMFM and/or JPMorgan Chase subsidiaries on the one hand and the sponsors of the Unaffiliated Funds on the other.

180.    The sponsors of the Unaffiliated Funds negotiate at arm's length with JPMFM and/or JPMorgan Chase subsidiaries regarding the fees paid to them for providing administration services to the Unaffiliated Funds.

38

181.    The Unaffiliated Funds' sponsors select administrators through a competitive selection process with multiple candidates submitting proposals.

182.    The Unaffiliated Funds' sponsors negotiate with administrators regarding the fees to be charged at the outset of the relationship and when contracts are subject to renewal. The negotiations include exchanges of proposals and counterproposals resulting in reductions in the fee rates paid by the sponsors of the Unaffiliated Funds to the administrators.

## THE EXCESSIVE INVESTMENT ADVISORY AND ADMINISTRATION FEES HARM THE FUNDS

183.    The investment advisory fees and the administration fees are paid out of each Fund's assets. Each dollar in fees paid by a Fund directly reduces the value of the Fund's investment portfolio.

184.    The payment of excessive investment advisory and administration fees to Defendants harms each of the Funds on a going forward basis because each Fund loses investment returns and profits it could earn on the amounts paid as excessive fees if those amounts were available for investment.

185.    Each Fund has sustained millions of dollars in damages due to the excessive investment advisory and administration fees paid to Defendants.

## COUNT I
## ON BEHALF OF THE MID CAP VALUE FUND
## AGAINST DEFENDANT JPMIM FOR VIOLATION OF SECTION 36(b)

186.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

187.    Plaintiffs assert this Count on behalf of and for the benefit of the Mid Cap Value Fund.

188.    JPMIM is the investment adviser to the Mid Cap Value Fund.

39

189.   Under Section 36(b), JPMIM owes a fiduciary duty to the Mid Cap Value Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

190.   JPMIM breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Mid Cap Value Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMIM and could not have been the product of arm's-length bargaining.

191.   As a direct, proximate, and foreseeable result of JPMIM's breach of its fiduciary duty under Section 36(b), the Mid Cap Value Fund has sustained millions of dollars in damages.

192.   Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Mid Cap Value Fund, the actual damages resulting from JPMIM's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Mid Cap Value Fund to Defendant and investment returns that would have accrued to the Mid Cap Value Fund if those fees were available for investment.

193.   Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAAs and restitution of all excessive investment advisory fees paid by the Mid Cap Value Fund pursuant to the IAAs.

**COUNT II**
**ON BEHALF OF THE LARGE CAP GROWTH FUND**
**AGAINST DEFENDANT JPMIM FOR VIOLATION OF SECTION 36(b)**

194.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

195.   Plaintiffs assert this Count on behalf of and for the benefit of the Large Cap Growth Fund.

196.   Defendant JPMIM is the investment adviser to the Large Cap Growth Fund.

197.    Under Section 36(b), JPMIM owes a fiduciary duty to the Large Cap Growth Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

198.    JPMIM breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Large Cap Growth Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMIM and could not have been the product of arm's-length bargaining.

199.    As a direct, proximate, and foreseeable result of JPMIM's breach of its fiduciary duty under Section 36(b), the Large Cap Growth Fund has sustained millions of dollars in damages.

200.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Large Cap Growth Fund, the actual damages resulting from JPMIM's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Large Cap Growth Fund to JPMIM and investment returns that would have accrued to the Large Cap Growth Fund if those fees were available for investment.

201.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAAs and restitution of all excessive investment advisory fees paid by the Large Cap Growth Fund pursuant to the IAAs.

**COUNT III**
**ON BEHALF OF THE VALUE ADVANTAGE FUND**
**AGAINST DEFENDANT JPMIM FOR VIOLATION OF SECTION 36(b)**

202.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

203.    Plaintiffs assert this Count on behalf of and for the benefit of the Value Advantage Fund.

204.    Defendant JPMIM is the investment adviser to the Value Advantage Fund.

205.    Under Section 36(b), JPMIM owes a fiduciary duty to the Value Advantage Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

206.    JPMIM breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Value Advantage Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMIM and could not have been the product of arm's-length bargaining.

207.    As a direct, proximate, and foreseeable result of JPMIM's breach of its fiduciary duty under Section 36(b), the Value Advantage Value has sustained millions of dollars in damages.

208.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Value Advantage Fund, the actual damages resulting from JPMIM's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Value Advantage Fund to JPMIM and investment returns that would have accrued to the Value Advantage Fund if those fees were available for investment.

209.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAAs and restitution of all excessive investment advisory fees paid by the Value Advantage Fund pursuant to the IAAs.

**COUNT IV**
**ON BEHALF OF THE MID CAP VALUE FUND**
**AGAINST DEFENDANT JPMFM AND JPMCB FOR VIOLATION OF SECTION 36(b)**

210.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

211.    Plaintiffs assert this Count on behalf of and for the benefit of the Mid Cap Value Fund.

212.    Defendant JPMFM is an affiliate of JPMIM and the administrator to the Mid Cap Value Fund.

213.    Defendant JPMCB is an affiliate of JPMIM and the sub-administrator to the Mid Cap Value Fund.

214.    Under Section 36(b), JPMFM and JPMCB owe a fiduciary duty to the Mid Cap Value Fund with respect to its receipt of administration fees and other compensation from the Mid Cap Value Fund.

215.    Defendant JPMFM and JPMCB breached its fiduciary duty under Section 36(b) by charging administration fees to the Mid Cap Value Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMFM and JPMCB and could not have been the product of arm's-length bargaining.

216.    As a direct, proximate, and foreseeable result of Defendant JPMFM and JPMCB's breach of its fiduciary duty under Section 36(b), the Mid Cap Value Fund have sustained millions of dollars in damages.

217.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Mid Cap Value Fund, the actual damages resulting from Defendant JPMFM and JPMCB's breach of its fiduciary duty, including the excessive administration fees paid by the

43

Mid Cap Value Fund to JPMFM and JPMCB and the investment returns that would have accrued to the Mid Cap Value Fund if those fees were available for investment.

218.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the JPMorgan Administration Agreement and restitution of all excessive administration fees paid by the Mid Cap Value Fund pursuant to the JPMorgan Administration Agreement.

**COUNT V**
**ON BEHALF OF THE LARGE CAP GROWTH FUND**
**AGAINST DEFENDANT JPMFM AND JPMCB FOR VIOLATION OF SECTION 36(b)**

219.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

220.    Plaintiffs assert this Count on behalf of and for the benefit of the Large Cap Growth Fund.

221.    Defendant JPMFM is an affiliate of JPMIM and the administrator to the Large Cap Growth Fund.

222.    Defendant JPMCB is an affiliate of JPMIM and the sub-administrator to the Large Cap Growth Fund.

223.    Under Section 36(b), JPMFM and JPMCB owe a fiduciary duty to the Large Cap Growth Fund with respect to its receipt of administration fees and other compensation from the Large Cap Growth Fund.

224.    Defendant JPMFM and JPMCB breached its fiduciary duty under Section 36(b) by charging administration fees to the Large Cap Growth Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMFM and JPMCB and could not have been the product of arm's-length bargaining.

225.     As a direct, proximate, and foreseeable result of Defendant JPMFM and JPMCB's breach of its fiduciary duty under Section 36(b), the Large Cap Growth Fund have sustained millions of dollars in damages.

226.     Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Large Cap Growth Fund, the actual damages resulting from Defendant JPMFM and JPMCB's breach of its fiduciary duty, including the excessive administration fees paid by the Large Cap Growth Fund to JPMFM and JPMCB and the investment returns that would have accrued to the Large Cap Growth Fund if those fees were available for investment.

227.     Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the JPMorgan Administration Agreement and restitution of all excessive administration fees paid by the Large Cap Growth Fund pursuant to the JPMorgan Administration Agreement.

### COUNT VI
### ON BEHALF OF THE VALUE ADVANTAGE FUND
### AGAINST DEFENDANT JPMFM AND JPMCB FOR VIOLATION OF SECTION 36(b)

228.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

229.     Plaintiffs assert this Count on behalf of and for the benefit of the Value Advantage Fund.

230.     Defendant JPMFM is an affiliate of JPMIM and the administrator to the Value Advantage Fund.

231.     Defendant JPMCB is an affiliate of JPMIM and the sub-administrator to the Value Advantage Fund.

232.     Under Section 36(b), JPMFM and JPMCB owe a fiduciary duty to the Value Advantage Fund with respect to its receipt of administration fees and other compensation from the Value Advantage Fund.

233.     Defendant JPMFM and JPMCB breached its fiduciary duty under Section 36(b) by charging administration fees to the Value Advantage Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMFM and JPMCB and could not have been the product of arm's-length bargaining.

234.     As a direct, proximate, and foreseeable result of Defendant JPMFM and JPMCB's breach of its fiduciary duty under Section 36(b), the Value Advantage Fund have sustained millions of dollars in damages.

235.     Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Value Advantage Fund, the actual damages resulting from Defendant JPMFM and JPMCB's breach of its fiduciary duty, including the excessive administration fees paid by the Value Advantage Fund to JPMFM and JPMCB and the investment returns that would have accrued to the Value Advantage Fund if those fees were available for investment.

236.     Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the JPMorgan Administration Agreement and restitution of all excessive administration fees paid by the Value Advantage Fund pursuant to the JPMorgan Administration Agreement.

**COUNT VII**
**ON BEHALF OF THE STRATEGIC INCOME OPPORTUNITIES FUND**
**AGAINST DEFENDANT JPMFM AND JPMCB FOR VIOLATION OF SECTION 36(b)**

237.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

238.    Plaintiffs assert this Count on behalf of and for the benefit of the Strategic Income Opportunities Fund.

239.    Defendant JPMFM is an affiliate of JPMIM and the administrator to the Strategic Income Opportunities Fund.

240.    Defendant JPMCB is an affiliate of JPMIM and the sub-administrator to the Strategic Income Opportunities Fund.

241.    Under Section 36(b), JPMFM and JPMCB owe a fiduciary duty to the Strategic Income Opportunities Fund with respect to its receipt of administration fees and other compensation from the Strategic Income Opportunities.

242.    Defendant JPMFM and JPMCB breached its fiduciary duty under Section 36(b) by charging administration fees to the Strategic Income Opportunities Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMFM and JPMCB and could not have been the product of arm's-length bargaining.

243.    As a direct, proximate, and foreseeable result of Defendant JPMFM and JPMCB's breach of its fiduciary duty under Section 36(b), the Strategic Income Opportunities Fund have sustained millions of dollars in damages.

244.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Strategic Income Opportunities Fund, the actual damages resulting from Defendant JPMFM and JPMCB's breach of its fiduciary duty, including the excessive administration fees paid by the Strategic Income Opportunities Fund to JPMFM and JPMCB and the investment returns that would have accrued to the Strategic Income Opportunities Fund if those fees were available for investment.

245.     Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the JPMorgan Administration Agreement and restitution of all excessive administration fees paid by the Strategic Income Opportunities Fund pursuant to the JPMorgan Administration Agreement.

**COUNT VIII**
**ON BEHALF OF THE US EQUITY FUND AGAINST DEFENDANT JPMFM AND**
**JPMCB FOR VIOLATION OF SECTION 36(b)**

246.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-185 above as if fully set forth herein.

247.     Plaintiffs assert this Count on behalf of and for the benefit of the US Equity Fund.

248.     Defendant JPMFM is an affiliate of JPMIM and the administrator to the US Equity Fund.

249.     Defendant JPMCB is an affiliate of JPMIM and the sub-administrator to the US Equity Fund.

250.     Under Section 36(b), JPMFM and JPMCB owe a fiduciary duty to the US Equity Fund with respect to its receipt of administration fees and other compensation from the US Equity Fund.

251.     Defendant JPMFM and JPMCB breached its fiduciary duty under Section 36(b) by charging administration fees to the US Equity Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by JPMFM and JPMCB and could not have been the product of arm's-length bargaining.

252.     As a direct, proximate, and foreseeable result of Defendant JPMFM and JPMCB's breach of its fiduciary duty under Section 36(b), the US Equity Fund have sustained millions of dollars in damages.

253.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the US Equity Fund, the actual damages resulting from Defendant JPMFM and JPMCB's breach of its fiduciary duty, including the excessive administration fees paid by the US Equity Fund to JPMFM and JPMCB and the investment returns that would have accrued to the US Equity Fund if those fees were available for investment.

254.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the JPMorgan Administration Agreement and restitution of all excessive administration fees paid by the US Equity Fund pursuant to the JPMorgan Administration Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of each of the Funds as follows:

A.    declaring that Defendants has violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory and administration fees from each Fund;

B.    permanently enjoining Defendants from further violations of Section 36(b);

C.    awarding compensatory damages against Defendants, including repayment to each Fund of all unlawful and excessive investment advisory fees and administration fees paid by such Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.      rescinding the IAA between JPMIM and the Advisory Claim Funds pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, including restitution to each Advisory Claim Fund of the excessive investment advisory fees paid to JPMIM by such Advisory Claim Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

E.      rescinding the JPMorgan Administration Agreement between JPMFM and the Funds pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, including restitution to each Fund of the excessive administration fees paid to JPMFM and JPMCB by such Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

F.      awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

G.      such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  October 16, 2015

**MEYER WILSON CO., LPA**

_/s/ Michael J. Boyle, Jr._____
David P. Meyer (Ohio Bar #0065205)
Matthew R. Wilson (Ohio Bar # 0072925)
Michael J. Boyle, Jr. (Ohio Bar #0091162)
1320 Dublin Road, Suite 100
Columbus, OH 43215

50

Tel: (614) 224-6000
Fax: (614) 224-6066

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Robin F. Zwerling (admission *pro hac vice* to
be filed)
Jeffrey C. Zwerling (admission *pro hac vice* to
be filed)
Susan Salvetti (admission *pro hac vice* to be
filed)
Andrew W. Robertson (admission *pro hac vice*
to be filed)
Ana M. Cabassa-Torres (admission *pro hac
vice* to be filed)
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

**ROBBINS ARROYO, LLP**
Stephen J. Oddo (admission pro hac vice to be
filed)
Gregory Del Gaizo (admission pro hac vice to
be filed)
600 B Street, Suite 1900
San Diego, CA 92101
Tel: (619) 525-3990
Fax: (619) 525-3991

*Attorneys for Plaintiffs*